No. 2772.

WILEY NORMAN *v.* THE STATE.

1. **Murder—Manslaughter—Fact Case.**—Under the law of this State, insulting words applied by the deceased to the wife of the slayer will reduce a homicide from murder to manslaughter, provided the killing occurred at the first meeting of the slayer and the deceased after the former was informed of the insult to his wife, and provided further that the insult was the *real* cause of the killing. But see the opinion and the statement of the case for evidence *held* sufficient to warrant the jury in finding that the insult was not the real cause of the killing, and therefore the conviction for murder in the second degree is sustained.

2. **Same—Charge of the Court.**—Upon the issue of manslaughter, the trial court charged the jury, in effect, that if they believed beyond a reasonable doubt that the accused killed the deceased, and that at the time of such killing he had been informed that the deceased used insulting language to his wife, and that he killed deceased at his first meeting with him after being so informed, and under the immediate influence of sudden passion arising from such information, and that such passion was sufficient to render his mind incapable of cool reflection, they should find him guilty of manslaughter. *Held,* correct as applied to the facts in proof.

APPEAL from the District Court of Red River. Tried below before the Hon. E. D. McClellan.

This conviction was in the second degree for the murder of J. D. Davidson, in Red River county, Texas, on the thirteenth day of June, 1887. The penalty assessed was a term of eight years in the penitentiary.

In adition to her testimony as set out in the opinion of this court, Mrs. Davidson, the widow of the deceased, testified that after the defendant fired the last and immediately fatal shot (either was necessarily a fatal wound), he started as though to leave the field, but turned and came towards the house, and witness met him. As they approached each other, the defendant pointed his gun at the witness but did not fire, and witness was unable to say whether or not the gun was then loaded. The witness then stated to the defendant's wife that she was the cause of the difficulty which resulted in the killing. The last visit of defendant's wife to defendant in the field occupied

no more time than it would take her to walk from the house to where the defendant was and back. Deceased had the farm rented, and by agreement his family and the defendant and his family occupied the house jointly, the defendant working land he had rented from Mr. Davidson Lowder. Witness at that time did not understand that the defendant had any interest in the recent purchase by McGuire of the farm rented by deceased. McGuire was the witness's brother, and the defendant's father-in-law. Deceased was in his shirt sleeves when killed, and had no weapon of any kind on his person. Doctor Bolling had deceased's pistol at the time, and after the killing witness told Bolling to keep it. The witness never saw Mrs. Norman after the killing until this trial. She heard the deceased use some profane language in the altercation with Mrs. Norman which preceded the killing, but he did not curse Mrs. Norman, nor threaten defendant's life. He said that he could "not stand this thing any longer; that either he or defendant would have to leave the place, and he would be d—d if it would be him." He used no other profane words.

In addition to his testimony as set out in the opinion, Davidson Lowder testified, for the State, that when defendant told him that he was going to the house and make the deceased retract the abuse of his wife, he advised the defendant to wait and cool off, as he was mad and did not know what he was doing. About three-quarters of an hour later witness's wife called him and told him that Mrs. Norman had reported the killing of deceased. Witness then went to his house and ascertained that, after leaving him in the field, the defendant went to his, witness's, house, and got a drink of alcohol from his wife, and witness's double barreled shot gun, of which one barrel was loaded with buck shot and one with duck shot. Witness then went to. Davidson's place and found the body of deceased, who was shot in two places—with buck shot in the breast and duck shot in the side. The ground near the body indicated that the parties met face to face, and that the shooting was done from a distance of about seven steps. As indicated by his foot tracks, the defendant was in full view of the deceased as he approached him. The witness sold the place occupied by defendant and deceased to McGuire, the father-in-law of the defendant, with the understanding that defendant was to help pay for it, and to own half of the land.

J. W. Warden testified, for the State, that he lived near

Whitewright, in Grayson county, Texas. During the summer of 1887, he took the defendant in his wagon from Whitewright to the house of his brother. On that trip the defendant told the witness that a short while previous he killed Davidson in Red River county, for cursing and abusing his wife. He said that his wife told him about Davidson cursing and abusing her, and threatening to kill him, and that he then went off and got a gun and killed Davidson

The State closed.

Mrs. Mattie Norman, the wife of the defendant, testified in his behalf that she closed the door to her part of the house between twelve and one o'clock on the fatal day, and, taking her child, went to the field, three-quarters of a mile distant, to help her husband hoe his cotton. She remained until about two hours by sun, when Doctor Bolling came to the field to help defendant, and she returned home. On arriving at her home she discovered that her door had been opened and left open, her things scattered, and her table depredated on by chickens. She said something about it, when Mrs. Davidson began a quarrel. Deceased, who was then sitting on a plow near the house, took up the quarrel, and cursed and abused witness unmercifully, calling her among other things "a d—d bitch." He also said that he could stand matters no longer, and that Norman had to leave there or he would kill him before night. Witness then told deceased that she was going to her husband at once and tell him what he had said. She went at once to the field where her husband and Doctor Bolling were, and told them all that had occurred. She told defendant that Davidson had been cursing and abusing her, and that he threatened to kill him, defendant, before night unless he moved away; and that among other things he called the witness "a d—d bitch." Defendant then left the field and went to Mr. Lowder's house, passing and speaking to Lowder en route. After the defendant left, Doctor Bolling asked the witness what it was all about, and witness repeated her story to him. Witness then went back to the house, and passed Mrs. Davidson sitting on the edge of the gallery, from which place it was impossible for her to see the place of the shooting. Witness went into her room, and twenty min_utes later she heard loud talking between defendant and deceased, followed by two shots. She rushed out of the house, and in doing so knocked her baby over. She was detained a moment in getting the child up, and as she went out she met Mrs.

Davidson coming from the direction in which her husband's body was lying. Mrs. Davidson then said: "Mattie, this would not have occurred but for you." Defendant then came into the house, got some clothes and left. Witness put on her shoes and went to Lowder's, meeting her husband on the way, for the last time until after his arrest. Defendant killed deceased at his first meeting with him after witness told him about deceased cursing and abusing her.

J. N. Bolling testified, for the defense, that on the evening of the killing he went into the field to help the defendant hoe cotton. Mrs. Norman, who was then there, went back to the house, and after awhile returned to the field, weeping. She then told defendant that deceased had cursed and abused her, and had threatened to kill defendant. Defendant asked what it was all about, and Mrs. Norman replied: "You know." Defendant then left the field, going by Lowder's house, and passing and speaking to Lowder on the way. After he left, Mrs. Norman told witness that deceased called her a "d—d whore." About the time it would take a man to walk from the field to the scene of the killing by way of Lowder's house, the witness heard two shots fired from a point near the house occupied by defendant and deceased. Defendant did not say what he was going to do when he left the field, but he was evidently very angry.

*Sims & Wright*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This conviction is for murder in the second degree.

The facts attending the homicide are related by the witnesses as follows: Mrs. Davidson, widow of the deceased, testified: "I saw the defendant shoot and kill the deceased. The defendant married my niece, and we were living in the same house. * * At the time of the killing a coolness had existed between the defendant and deceased for about two weeks. I noticed that they had stopped speaking. * * About one o'clock the wife of the defendant left the house, saying that she was going to the field to assist her husband. She took her only child with her. About one hour by sun she returned, and the door to her part of the house having been left open by some of

my children, some words took place between us, and my husband, hearing the same, as he was plowing near by, asked what was the matter, and, being informed, some words were exchanged between him and the wife of defendant.   While he did not curse her he used some 'cuss words;' the words between them amounted to but little.   Mrs. Norman (defendant's wife) then left and was gone one-half hour.   When she returned she acted like she was excited.   *   *   She kicked the door open, and from what I could hear I think she was putting on her shoes.   I was sitting on the gallery at a point where I could not see my husband at the time.   About the time Mrs. Norman came up I heard the voice of a man, can't say who, and I went to where I could see my husband holding on the plow handles [he was plowing cotton].   At this time I saw defendant taking his gun partially down from his face, and just at this time he put the gun back to his face and fired, when my husband fell to the ground, and, starting to rise, defendant fired again, when deceased fell over and expired."

Mr. Lowder testified:   "On the day of the shooting I was in the field plowing, about one hundred and fifty or two hundred yards from where defendant and Doctor Bolling were hoeing cotton.   About one or two hours by sun I saw Mrs. Norman in the field, and soon after the defendant came by where I was plowing, and said that deceased had been abusing his wife, and that he was going to the house to make him take it back.   *   *   *   I saw that he was mad.   I knew that a coolness existed between defendant and deceased."

Mrs. Norman testified that, in the quarrel at the house, deceased cursed her and called her a d—d bitch.   "I then went to the field and told my husband that deceased had been cursing and abusing me, and that he had also threatened to kill him before night unless he moved away.   I told Norman, among other things said was that deceased called me a d—d bitch."

J. N. Bolling, who was with defendant when Mrs. Norman came to him in the field, testified that she "came up crying, and told her husband that the deceased had been cursing and abusing her, and had also threatened to kill defendant.   *   *   *   Defendant asked her what it was all about, and she said: 'You know.'"

A witness for the State testified that the defendant told him

"that he had killed Davidson * * * for abusing and curs-
ing his wife; he also said something about deceased having
threatened to kill him before night—that is, that he was so in-
formed by his wife."

The evidence further shows that defendant went by the
house of the witness Lowder and secured Lowder's gun, and
that the homicide occurred at about the time it would take him
to go from the field where he was at work, by Lowder's house,
to the place where deceased was killed.

It will be seen that the question is: Does the evidence sup-
port the conviction for murder in the second degree? Appel-
lant, by counsel, contends that the killing resulted from the pas-
sion produced by the insulting words used by the deceased to-
wards his, appellant's, wife, and therefore that he was guilty of
no greater offense than manslaughter.

At common law, under the circumstances attending this
homicide, the slayer would have been guilty of murder. But a
very great concession is made to the weakness of our nature by
the statute of this State. Hence, if the killing takes place at
the first meeting of the parties after the party killing has been
informed of such insult, the slayer would be guilty of man-
slaughter and not murder; provided the insulting words were the
real cause which provoked the killing. Here there is a ques-
tion of fact to be solved by the jury, it being expressly provided
by article 600, Penal Code, that "the jury shall be at liberty to
determine in every case whether, under all the circumstances,
the insulting words were the real cause which provoked the
killing."

In this case the jury have determined that the insulting
words were not the *real* cause which provoked the killing.

In thus determining, have they, under the facts of this case,
abused their discretion and arbitrarily deprived the appellant
of his rights given him by the statute? Are there no facts in
the record justifying the jury in attributing the killing to other
causes besides the insulting words? We think so. The killing
may have been induced by the threat made by deceased to kill
defendant before night, unless he moved; or it may have been
caused by the reference which was made by deceased in the al-
tercation of words between deceased and appellant's wife,
which is not named; for, when Mrs. Norman told her husband
that the deceased had been cursing and abusing her, etc., ap-
pellant asked her "what it was all about?" and she answered,

"you know." This clearly shows that there was another matter in regard to which a bad state of affairs had grown up between the parties.

Counsel for appellant objects to the charge of the court upon the law of manslaughter. In the record we find bills of exceptions relating to the charge, but they are very general. The fifteenth clause is specially alleged to be erroneous. It is as follows:

"If you believe from the evidence, beyond a reasonable doubt, that the defendant    *    *    *    did unlawfully and voluntarily shoot and kill J. D. Davidson with a gun, and you further so believe that, at the time of such killing, the defendant had been informed that J. D. Davidson had used insulting words towards the defendant's wife, and killed him at his first meeting with him thereafter, under the immediate influence of the passion arising in his mind from such information, and that such passion was sufficient to render his mind incapable of cool reflection, then you will find him guilty of manslaughter."

This charge very clearly and pertinently applies the law to the facts of this case, and is without error, especially when viewed with reference to the whole charge. There is no error specifically pointed out in the bill of exceptions.

Appellant objects to the following expressions in the charge upon manslaughter: "If the person guilty of the homicide is informed and believes," etc.; "and if such passion was sufficient to render the mind incapable of cool reflection." Viewed in their real connection with other parts of the charge upon the law of manslaughter, we can perceive no error in these excerpts.

There is no evidence presenting the question of self defense, and the court did not err in refusing to charge thereon.

We find no error in this judgment, and it is affirmed.

*Affirmed.*

Opinion delivered October 24, 1888.